# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------X

THOMAS GRANADOS, Individually and on
Behalf of All Others Similarly Situated,

               Plaintiff,

    v.

ART TECHNOLOGY GROUP, INC.,
ROBERT D. BURKE, DAVID B.
ELSBREE, DANIEL C. REGIS, JOHN R.
HELD, PHYLLIS S. SWERSKY,
MICHAEL A. BROCHU, MARY E.
MAKELA, GREGORY HUGHES,
ORACLE CORPORATION, and
AMSTERDAM ACQUISITION SUB
CORPORATION,

               Defendants.

-------------------------------------------------------X

**Civil Action No. 1:10-cv-11931-DPW**

**AMENDED COMPLAINT FOR
INDIVIUDAL CLAIM FOR VIOLATION
OF SECTION 14(a) AND 20(a) OF THE
SECURITIES EXCHANGE ACT OF 1934
AND CLASS ACTION FOR BREACH OF
FIDUCIARY DUTY**

**JURY TRIAL DEMANDED**

Plaintiff Thomas Granados ("Plaintiff"), by and through his attorneys, alleges the following as to himself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein:

## INTRODUCTION

1.     This is both an individual action and a shareholder class action brought by Plaintiff on behalf of the public holders of Art Technology Group, Inc. ("ATG" or the "Company"), seeking to enjoin certain actions of the defendants in connection with the proposed acquisition of ATG by Oracle Corporation and its wholly owned subsidiary Amsterdam Acquisition Sub Corporation (collectively "Oracle").

2.     Specifically, on November 2, 2010, ATG announced that the Company entered into a definitive Agreement and Plan of Merger ("Merger Agreement"), pursuant to which Oracle will acquire ATG in exchange for payment of $6.00 per shares in a transaction valued at approximately $1 billion (the "Proposed Transaction").

3.     The Proposed Transaction appears designed to simply provide Oracle with the ability to recognize the remarkable potential ATG has as a company, allow Oracle to capitalize on ATG's recent introduction of new products and customers, and to provide ATG insiders with a windfall in the form of lucrative severance and change-of-control benefits, rather than allow ATG shareholders to enjoy the Company's growth potential.

4.     In pursuing the unlawful plan to facilitate the Proposed Transaction, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing.

5.     Similarly, in an attempt to induce shareholder approval of the unfair Proposed Transaction, Defendants caused to be filed with the Securities and Exchange Commission

("SEC") a false and misleading preliminary proxy statement, 14A, on November 19, 2010 (the "Proxy"), which also serves as the proxy for the required vote by ATG shareholders.  Among other things, the Proxy misstates and/or fails to disclose material information concerning:  the process leading to the Proposed Transaction and the financial information underlying the analyses performed by Morgan Stanley & Co. ("Morgan Stanley") in support of the Proposed Transaction.  The material misstatements and omissions contained in the Proxy constitute violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

6.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants (defined below) from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (defined below) violations of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

8.     Further, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), (c), and (d) as Plaintiff and the defendants are citizens of and domiciled in different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  Given that the Proposed Transaction is valued at $1 billion, the injunctive relief sought herein will exceed a sum or value of $75,000.  This action is not a collusive one to confer jurisdiction on this Court.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because one or more of the defendants, including ATG either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District. Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

10.     Plaintiff is, and at all material times hereto has been, a holder of ATG common stock.  Plaintiff is a citizen of the United Kingdom.

11.     Defendant Art Technology Group, Inc. ("ATG" or the "Company"), is a Delaware corporation with its principal headquarters located at One Main Street, Cambridge, Massachusetts 02142.   ATG develops and markets a comprehensive suite of e-commerce software products that businesses can employ to increase their online revenues and profitability. Customers can use the Company's products and related services to power their e-commerce websites, attract prospects, convert sales, increase order sizes and encourage return customers. ATG common stock trades on the NASDAQ Exchange under the ticker symbol "ARTG." According to the Company's quarterly report for the period ended June 30, 2010, filed with the SEC, there were nearly 158,112,163 shares of ATG outstanding as of July 30, 2010.

12.     Defendant Robert D. Burke ("Burke") has served as a director, Chief Executive Officer and President of the Company since December 2002.   Upon information and belief, Burke is a citizen of Boxford, Massachusetts.

13.     Defendant David B. Elsbree ("Elsbree") has served as a director of the Company since June 2004 and is the Chairman of the Board of Director's ("Board") Audit Committee. Upon information and belief, Elsbree is a citizen of Wellesley Hills, Massachusetts.

14.      Defendant Daniel C. Regis ("Regis") has served as a director of the Company since November 2004 and as Chairman of the Board since July 2005.  Regis served on the Board of Directors of Primus Knowledge Solutions, Inc., from April 2003 until ATG acquired Primus in November 2004.  Regis is the managing partner of Digital partners, a venture capital firm located in Seattle, Washington, which he co-founded in 2000.  Regis is also a member of the Board of Directors of Cray, Inc. and Columbia Banking Systems, Inc.  Upon information and belief, Regis is a citizen of Oak Harbor, Washington.

15.      Defendant John R. Held ("Held") has served as a director of the Company since July 2002. Held is also a director of BNS Holding, Inc.   Upon information and belief, Held is a citizen of Bolton, Massachusetts.

16.      Defendant Phyllis S. Swersky ("Swersky") has served as a director of the Company since May 2000.  Upon information and belief, Swersky is a citizen of Newton Center, Massachusetts.

17.      Defendant Michael A. Brochu ("Brochu") has served as a director of the Company since November 2004, when he was added to the Board in connection with the acquisition of Primus Knowledge Solutions, Inc.  From November 1997 until the acquisition of Primus in November 2004, Brochu served as the President, Chief Executive Officer, and Chairman of the Board of Primus.  Since June 2007, Brochu has been President, Chief Executive Officer, and a director of Global Market Insite, Inc., a global market intelligence provider.  Brochu is also a member of the advisory board for Voyager Capital, a venture capital firm located in Seattle, Washington.  Upon information and belief, Brochu is a citizen of Bellevue, Washington.

18.     Defendant Mary E. Makela ("Makela") has served as a director of the Company since July 2002.  Upon information and belief, Makela is a citizen of Falmouth, Massachusetts.

19.     Defendant Gregory Hughes ("Hughes") has served as a director of the Company since May 24, 2010.  Upon information and belief, Hughes is a citizen of Menlo Park, California.

20.     The defendants named in ¶¶12-19 are sometimes collectively referred to herein as the "Individual Defendants"

21.     Defendant Oracle Corporation is a Delaware corporation with its principal headquarters located at 500 Oracle Parkway, Redwood City, California 94065.   Oracle Corporation develops, manufactures, markets, distributes and services enterprise software systems and hardware systems such as servers and storage products.

22.     Defendant Amsterdam Acquisition Sub Corporation is a Delaware corporation and a wholly-owned subsidiary of Oracle Corporation, with its principal headquarters located at 500 Oracle Parkway, Redwood City, California 94065.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES
### UNDER STATE LAW

23.     By reason of the above Individual Defendants' positions with the Company as directors and/or officers, said individuals are in a fiduciary relationship with Plaintiff and the other stockholders of ATG who are being and will be harmed by the defendants' actions described herein and owe Plaintiff and the other members of the Class (as defined herein) a duty of highest good faith, fair dealing, loyalty and full and adequate disclosure.

24.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control,

the applicable state law requires the directors to take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves.  To diligently comply with this duty, the directors of a corporation may not take any action that:

        A.     adversely affects the value provided to the corporation's shareholders;

        B.     contractually prohibits them from complying with or carrying out their fiduciary duties;

        C.     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

        D.     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

25.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of ATG, are obligated under applicable law to refrain from:

        A.     participating in any transaction where the directors' or officers' loyalties are divided;

        B.     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

        C.     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

26.     The Individual Defendants are also obliged to honor their duty of candor to ATG's shareholders by, *inter alia*, providing all material information to the shareholders regarding a scenario in which they are asked to vote or tender their shares in favor of an

acquisition proposal.  This' duty of candor ensures that shareholders have all information that will enable them to make informed and rational decisions about whether to relinquish their shares in exchange for the consideration offered.

27.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public shareholders of ATG.  The Individual Defendants stand on both sides of the transaction, are engaging in self dealing, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiff or the Class.  As a result of the Individual Defendants' self dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their ATG common stock in the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

28.    Plaintiff brings the Exchange Act claims on behalf of himself individually. Plaintiff brings the state law claims pursuant to Rule 23 on behalf of himself and as a class action, on behalf of all holders of ATG common stock who are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

29.    This action is properly maintainable as a class action.  The Class is so numerous that joinder of all members is impracticable.  There are over 158 million shares of ATG's common stock outstanding.  These shares are held by hundreds, if not thousands, of beneficial holders.

30.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

A.     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

B.     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

C.     whether the Individual Defendants have breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

D.     whether ATG and the Individual Defendants have disclosed all material information regarding the Proposed Transaction;

E.     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

F.     whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

G.     whether ATG and Oracle are aiding and abetting the wrongful acts of the Individual Defendants.

31.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

32.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

33.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

34.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

35.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**SUBSTANTIVE ALLEGATIONS**

**ATG'S Growth Potential Is Undeniable**

36.     ATG develops and markets a comprehensive suite of e-commerce software products that businesses employ to increase their online revenues and profitability.   ATG's customers use the Company's products and related services to power their e-commerce websites, attract prospects, convert sales, increase order sizes and encourage return customers.

37.     ATG Commerce is a comprehensive, scalable e-commerce platform and set of e-commerce applications that is delivered through perpetual software licenses, software as a service, or SaaS, or on a managed services basis.   The Company markets its products and services principally to Global 2000 companies and other businesses in the retail, telecommunications, media and entertainment, distribution, and consumer goods manufacturing industries.   As of January 31, 2010, ATG had approximately 1,200 clients, including AT&T,

Best Buy, Conde Nast, CVS, DirecTV, Intuit, JC Penney, Lego, Sprint, Tesco, Vodafone and Williams-Sonoma. The Company also generates product revenue by co-selling with partners, which consist of selected solution and technology providers around the world, including global systems integrators such as Accenture, Acquity Group, Capgemini, CGI, Deloitte Consulting, Infosys and Sapient, as well as regional systems integrators and interactive agencies such as Aaxis Group, Empathy Lab, LBi Group, Professional Access, Razorfish and Resource Interactive.

38.    ATG has been able to demonstrate record financial performance and growth despite the economic downturn during the past two years. For example, on February 5, 2009, the Company announced record revenue, non-GAAP net income and cash flow from operations for 2008. According to this announcement, revenue for the full year 2008 grew to $164.6 million, a 20% increase over full year 2007 revenue of $137.1 million. Likewise, cash flow from operations for the fourth quarter of 2008 was $11.6 million, a 176% increase over cash flow from operations of $4.2 million in the fourth quarter of 2007, and cash flow from operations for the full year 2008 was $34.1 million, a 30% increase over full year 2007 cash flow from operations of $26.3 million. Similarly, non-GAAP net income for the full year 2008 increased to $17.6 million, or $0.13 per diluted share compared with non-GAAP net income of $7.9 million, or $0.06 per diluted share in 2007.   ATG also announced that it had added 8 new customers for its commerce solutions and 7 net new customers purchased eStara e-commerce optimization services in the fourth quarter alone. New and repeat business was generated in 2008 from customers including B&Q (a subsidiary of Kingfisher), Collective Brands, Corel, DirecTV, HEB Grocery, Lexmark, Shop Direct Group, and Sephora.

39.    Commenting on these results, defendant Burke stated:

We are extremely pleased with ATG's strong financial performance in the fourth quarter. Our results demonstrated that, even in challenging economic times, companies continued to invest in e-commerce.

40.     Julie Bradley, ATG's senior vice president and CFO, further commented, stating:

*ATG's ability to achieve record financial results was driven by increased demand for best of breed e-commerce solutions and our dedication to profitable revenue growth.* While the macroeconomic climate is uncertain, we believe that over the long term, customer demand for our products will remain strong.

41.     Again, on February 1, 2010, ATG reported record revenue and net income for 2009. Specifically, revenue for the full year 2009 grew to $179.4 million, a 9% increase over full year 2008 revenue of $164.6 million. Meanwhile, GAAP net income for the full year 2009 increased to $16.8 million, or $0.13 per diluted share compared with GAAP net income of $3.8 million, or $0.03 per diluted share in 2008, and non-GAAP net income for the full year 2009 increased to $27.5 million, or $0.21 per diluted share compared with non-GAAP net income of $17.6 million, or $0.13 per diluted share in 2008. Moreover, in the fourth quarter alone, ATG was able to add Canal +, Fifth Third Bank, Gordon Foods, Kaiser Permanente, MeadWestvaco, Time Warner, Woolworths, Sur La Table and Backcountry.com as new customers for their e-commerce products and services.

42.     Commenting on the results, defendant Burke noted that the Company was poised for further financial success, stating:

2009 was another year of record financial results and significant accomplishments for ATG. *Revenue and net income were the highest in company history and we signed an impressive roster of new customers throughout the year. Looking ahead to 2010, we are very excited about customer demand as companies continue to invest in e-commerce.*

43.     Similarly, Bradley, ATG's senior vice president and CFO highlighted the fact that the Company was able to achieve these stellar results while simultaneously investing for future growth, stating:

11

We are extremely pleased with our 2009 results. *Through strong execution and cost containment efforts, we were able to increase revenue while expanding gross margins and net income. We achieved these results while continuing to invest in our business for future growth in 2010 and beyond.*

44.     Throughout the course of 2010, the Company continued to announcement year over year growth, strong financial performance and new customers.  For example, on April 25, 2010, the Company announced that first quarter revenue increased 7%, product license bookings increased 13%, even though 38% of product license bookings were deferred in the first quarter and will be recognized in future periods, and an increase in cash flow from operations increased 17%.  Commenting on these results, defendant Burke again emphasized that ATG was well poised for continued growth, stating:

ATG got off to a great start in 2010 with solid year-over-year growth in product license bookings.  *We are seeing positive market trends and strong results for ATG across both our Commerce and Optimization businesses*.

45.     Again on July 29, 2010, the Company announced that  second quarter revenue increased 11%, deferred revenue increased 23%, product license bookings increased 10% and cash flow from operations increased 62%.   Defendant Burke boasted that these financial results demonstrated that ATG was poised for continued growth, stating:

ATG delivered another strong quarter with double-digit revenue, license bookings and cash flow from operations growth.  *Going into the second half of the year, we continue to see healthy demand for both our Commerce and Optimization businesses.*

46.     Moreover, during the third quarter, the Company has continued to attract substantial new customers, introduce new or improved software products and services, and expanded its relationships with existing partners.  For example, during the third quarter, ATG added TELUS, the largest telecommunications company in western Canada, Build-A-Bear

Workshop, Inc., bol.com, a large on-line retailer in the Netherlands, and John Lewis, a large on-line clothing retailer as new customers.

47.     Moreover, on September 27, 2010 the Company announced the release of ATG Commerce 10, the most significant new release of ATG Commerce in ten years.  The Company claims this new release "is designed to help merchants speed commerce implementations, improve merchandising, rapidly launch multiple sites, and easily expand into new markets." With regards to this new release, defendant Burke stated:

> For years ATG Commerce has led the market with the most flexible and innovative technology.  For companies of all sizes, whether large enterprises or mid-sized businesses, ATG Commerce 10 will reduce the burden on lean IT and merchandising teams, making it simpler for merchants to get multiple sites and channels up and running. With ATG Commerce 10, we are executing on our *Commerce Anywhere* vision, making it easier than ever for any company to deliver a personalized shopping and buying experience optimized for mobile devices, social media, and cross-channel interactions.

48.     Similarly, on November 1, 2010, the Company announced the expansion of its ATG Catalyst program, whereby the Company joined forces with a number of complementary software provider partners to deliver new, pre-built integrations and extensions for ATG Commerce via the ATG Catalyst program.  The Catalyst Alliance Program (CAP) makes it easy for partners to share these integrations via the ATG Catalyst library of assets on community.atg.com and gives ATG customers, integrators, and developers access to an extensive library of no-cost software assets that reduce the overall time and cost of a typical commerce implementation.

49.     Then, on November 2, 2010, in the same press release announcing the Proposed Transaction, the Company announced its financial results for the third quarter, again announcing significant year over year increases.  Specifically, ATG announced revenue for the third quarter of 2010 grew to $50.3 million, a 16% increase over third quarter 2009, a 37% increase in product

license bookings to $14.2 million for the third quarter, an increase in net income in accordance

with GAAP for the third quarter of 2010 to $4.2 million, and 45% growth in non-GAAP net

income to $8.0 million for the third quarter of 2010, compared with non-GAAP net income of

$5.5 million for the third quarter of 2009.  Additionally, the Company announced that cash flow

from operations increased a stunning 51% for the third quarter of 2010 to $14.9 million,

compared to $9.9 million in the third quarter of 2009.  In a note to ATG employees before a

"town hall meeting," defendant Burke boasted of these "strong Q3 financial results," stating:

> Speaking of that success, ***we were thrilled with our Q3 financial performance
> that was also just announced today. In Q3 we had very strong bookings (a 37%
> increase over Q3 of 2009) along with solid revenue and profit performance. Our
> balance sheet is very strong—we have no debt and ended Q3 with over $180M
> of cash, cash equivalents & marketable securities, a record level for ATG.***

50.     Rather than permitting the Company's shares to continue trade freely and

allowing its public shareholders to reap the benefits of the Company's investment in future

growth, new customers and products, record cash on hand and ever increasingly positive

prospects and future financial success, the Individual Defendants acted for their own benefit and

the benefit of Oracle, and to the detriment of the Company's public shareholders, by entering

into the Proposed Transaction.  The Individual Defendants' effectively capped ATG's price at a

time when the Company's stock was poised to capitalize on its positive and encouraging

financial outlook.

**The Proposed Transaction**

51.     On November 2, 2010, the same day that the Company announced its third

quarter results, ATG also announced that it had entered into the Merger Agreement whereby

Oracle would acquire the Company for $6.00 per share in cash, or approximately $1.0 billion.

14

52. In discussing the Proposed Transaction, both ATG and Oracle executives emphasized the benefits the merger would provide for Oracle, not ATG's public shareholders. For example, commenting on the Proposed Transaction, defendant Burke stated:

> More than 1,000 global enterprises rely on ATG's solutions to help increase the value of their online customer interactions. This combination will enhance the ability to bring all their commerce activities together – creating a more consistent and relevant experience for their customers across all interaction channels, including online, in stores, via mobile devices and with call centers.

53. Likewise, Bob Weiler, Executive Vice President, Oracle Global Business Units stated:

> The addition of ATG, which brings market-leading products used by some of the largest and most well-known retailers and brands, furthers Oracle's strategy of delivering industry-specific enterprise applications. This acquisition builds upon our dedication to offer the most complete and integrated suite of best-of-breed software applications and technologies required to power the most demanding companies in the world in every industry.

54. Similarly, Thomas Kurian, Executive Vice President Oracle Development stated:

> Driven by the convergence of online and traditional commerce and the need to increase revenue and improve customer loyalty, organizations across many industries are looking for a unified commerce and CRM platform to provide a seamless experience across all commerce channels. Bringing together the complementary technologies and products from Oracle and ATG will enable the delivery of next-generation, unified cross-channel commerce and CRM.

55. Conspicuously absent from ATG's own press release announcing the Proposed Transaction was any discussion of the benefits the Proposed Transaction provided to its public shareholders. Indeed, the next day, Mike Latimore, an analyst at Northland Securities downgraded ATG stock on due to the cap placed on ATG stock by the Proposed Transaction.

56. Analysts echoed the executives, highlighting the benefits to Oracle from the acquisition of ATG at such a reasonable price. For example, analyst Walter Pritchard noted that Oracle's acquisition of ATG will allow it to compete in the sector with computer giant IBM,

software titan Microsoft and smaller companies, such as GSI Commerce and Digital River. Pritchard stated: "Art Technology Group brings a robust e-commerce front-end to Oracle's vertical solutions in retail and increasingly other verticals."

57.     Similarly, in a research note, Wells Fargo analyst Jason Maynard said that "from a competitive standpoint, we think this deal helps fill a hole in the Oracle product suite and could become a catalyst to win customer-care deals against RightNow and Salesforce.com in the retail, telecommunications and financial-services vertical."

58.     Likewise, J.P. Morgan analyst John DiFucci wrote that he sees ATG as "a complementary asset to Oracle's platform, whereby Oracle's sales-channel scale and cross-selling opportunities can significantly improve the market influence of ATG in short order."

59.     Meanwhile Avian Securities analyst Jeff Gaggin noted "It's a nice, safe acquisition for Oracle," adding that the deal will expand Oracle's retail software portfolio.

60.     The consideration offered to ATG's public stockholders in the Proposed Transaction, however, is unfair and grossly inadequate because, among other things, the intrinsic value of ATG's common stock is materially in excess of the amount offered for those securities in the Proposed Transaction given the Company's new customers, improved product lines, recent financial successes and prospects for future growth and earnings.

61.     While ATG's shareholders are offered grossly inadequate compensation for their Company stock, certain of the Individual Defendants and other key Company executives fare far better under the terms of the Merger Agreement.  For example, defendant Burke has a change of control provision in his employment agreement which assures him eighteen months of full salary, bonuses and benefits, immediate vesting of all stock options and equity awards, and tax "gross up" payments to compensate him for any excise taxes that he may owe under Section

4999 of the Internal Revenue Code of 1986 as a result of payments made to him in connection with the change in control.  As of December 31, 2009, it was estimated that Burke's continued salary, bonuses and benefits would result in payments to Burke of $1,381,707.  Moreover, as of December 31, 2009, Burke had 368,000 unvested restricted stock awards, for which he will receive $4,510,000, 125,001 unvested options to purchase ATG stock with exercise prices as low as $2.93 per share for which he will receive an instant net profit of $301,628, and vested options to purchase 1,664,999 shares of ATG stock at exercise prices as low as $1.27 per share, for which he will receive an additional $7,194,571 in instant net profit.  Thus, upon a change of control such as would occur upon consummation of the Proposed Transaction, Burke stands to receive total payments of $13,387,906.

62.     Moreover, as of December 31, 2009, the directors and officers of ATG collectively as a group, including defendants Burke, Brochu, Regis, Elsbree, Makela and Swersky, held options, not all of which were vested, to purchase 5,918,798 shares of ATG common stock which upon approval of the Proposed Transaction will be vested and will result in an instant profit of millions of dollars to the Individual Defendants and other Company executives.

63.     Moreover, Oracle has publicly indicated its intention to retain ATG's key management personnel, stating "ATG's management and employees have significant domain expertise in Commerce solutions and software, and are expected to join Oracle, after the transaction closes."  Therefore, ATG management's stock options and restricted stock units will immediately vest and be cashed out, yet management will retain their positions and lucrative salaries. Bonuses, benefits and incentive compensation.

64.     The Proposed Transaction comes at a time when the Company's stock price is undervalued but its prospects for growth and increased revenue are substantially increasing as the economic recession is ending and as ATG continues to successfully implement its cost containment while expanding its customer base and product offerings with the introduction of ATG Commerce 10.   ATG insiders are well aware of the Company's intrinsic value and that ATG shares are significantly undervalued.   Oracle recognized ATG's solid performance and potential for growth and determined to capitalize on the fact that the Company's stock is currently undervalued at the expense of ATG's public shareholders.   Oracle is seeking to engage in a transaction that secures an opportunity to benefit from the Company's growth, while the Company's shareholders are provided inadequate consideration without the benefit of a full and fair sales process.

65.     Under the circumstances, the Individual Defendants are obligated to explore all alternatives to maximize shareholder value.

**The Preclusive Deal Protection Devices**

66.     The entire process deployed by Oracle and ATG's Board is also unfair and inadequate.   As part of the Merger Agreement, defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait d'accompli*.   These deal protection devices effectively eliminate the potential for competing offers and bidders to the detriment of ATG shareholders.   Moreover, the Merger Agreement prevents the members of the ATG Board from complying with its fiduciary duties to maximize shareholder value by soliciting such competing bids or proposals.

67.     First, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Board from taking any affirmative action to comply with their fiduciary duties to

18

maximize shareholder value, including soliciting proposals relating to alternative acquisition offers or business combinations. The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations.

68.     Section 6.03(a) of the Merger Agreement contains the "no shop" provision, which provides in relevant part:

> Neither the Company nor any of its Subsidiaries shall, nor shall the Company or any of its Subsidiaries authorize or permit any of its or their Representatives to, and the Company shall instruct, and cause each applicable Subsidiary, if any, to instruct, each such Representative ***not to, directly or indirectly, solicit, initiate or knowingly take any action to facilitate or encourage the submission of any Acquisition Proposal or the making of any inquiry, offer or proposal that could reasonably be expected to lead to any Acquisition Proposal*** . . .

69.     Section 6.03(a) also contains the "standstill" provision which provides in relevant part:

> The Company shall, and shall cause its Subsidiaries and its and their respective Representatives to cease immediately and cause to be terminated, and shall not authorize or knowingly permit any of its or their Representatives to continue, any and all existing activities, discussions or negotiations, if any, with any Third Party conducted prior to the date hereof with respect to any Acquisition Proposal and shall use its reasonable best efforts to cause any such Third Party (or its agents or advisors) in possession of non-public information in respect of the Company or any of its Subsidiaries that was furnished by or on behalf of the Company and its Subsidiaries to return or destroy (and confirm destruction of) all such information.

70.     Section 6.03(b) of the Merger Agreement provides a limited situation under which the ATG Board may enter into discussions and negotiations for a "bona fide unsolicited n competing unsolicited bid, only after the Board determines that the alternative acquisition proposal "constitutes or would reasonably be expected to result in a Superior Proposal," but only after "the Company Board determines in good faith, after consultation with outside legal counsel

to the Company Board, that the failure to take such action would be a breach of its fiduciary duties under Applicable Law."   Even then, however, the ATG Board is required to provide Oracle with written notice of the identity of the party and terms of such an acquisition proposal three business days before it takes any action with respect to such an unsolicited Acquisition Proposal – even before providing the potential acquirer with any Company information.

71.     Thus, even if the ATG Board receives an intervening unsolicited bid that appeared to be "superior" to Oracle's offer, they are precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is, in fact, "superior" and provides Oracle with three days notice of receipt of the offer. Consequently, this provision prevents the ATG Board from exercising their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the ATG Board first determines that the proposal is "superior."

72.     Further, in connection with the Proposed Transaction, the ATG Board amended the Company's Poison Pill rights plan ("Poison Pill") to exclude the Proposed Transaction from its scope (the "Amendment").   Under the terms of the Amendment, however, any potential alternative suitor would still remain subject to the provisions of the Rights Plan.  The application of the Rights Plan to any unsolicited Alternative Acquisition proposal assures that no competing bid could emerge.

73.     Under the terms of the Poison Pill, each share of common stock has attached to it a "Right" that entitles the holder to purchase one one-thousandeth of a share of ATG Series A Junior Participating Stock ("Preferred Stock") ten days after the announcement or effectuation of any transaction by a party acquiring 15% or more of the Company's common stock ("Acquiring Person").  Each of these shares of Preferred Sock entitle the holder to receive, when, as and if

declared by the Board, a minimum preferred quarterly dividend payment of the greater of $10.00 per share or an aggregate dividend of 1,000 times the dividend declared per share of common stock. Each share of Preferred Stock also has 1,000 votes, voting together with the common stock. Furthermore, the Preferred Stock has a liquidation preference of the greater of $1,000 per share, plus all accrued and unpaid dividends, or an aggregate payment of 1,000 times the payment made per share of common stock. Similarly, in the event of a merger or acquisition, each share of Preferred Stock is entitled to receive 1,000 times the amount received per share of common stock.

74.     In addition to the right to purchase the Preferred Stock, if any party becomes an Acquiring Person, each right upon exercise also entitles the holder to purchase that number of shares of ATG common stock which equals the exercise price of the Right divided by 50% of the current market price of ATG common stock. Alternatively, if the Company is acquired in a merger or other business combination, or if 50% or more of the Company's assets or earning capacity is sold or transferred, each Right holder is entitled to receive the number of shares of common stock of the acquiring company that equals the exercise price of the Right divided by 50% of the current market price of such common stock.

75.     Under the Poison Pill these rights are invalidated if the stock is acquired by an Acquiring Person. Under the Amendment, however, these provisions only apply to any potential bidding party other than Oracle. Consequently, the Poison Pill standing alone will serve to assure that no competing bids will emerge.

76.     Moreover, concurrently with the execution of the Merger Agreement, the officers and directors of ATG, including the Individual Defendants, entered into Voting Agreements with Oracle that bind the insiders to vote in favor of the Proposed Transaction.

77.     Further, the Merger Agreement requires ATG to pay a $33.5 million termination fee and up to $5 million of Oracle's expenses if ATG terminates the Proposed Transaction. Together with the aforementioned onerous terms, the termination fee ensures no competing bid will surface to the detriment of Smithtown shareholders.

**The Materially Misleading And/Or Incomplete Proxy**

78.     In order to secure shareholder approval of this unfair deal, Defendants filed with the SEC a materially misleading and incomplete Proxy on November 19, 2010.  The Proxy, which recommends that ATG shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company.  Specifically, the Proxy omits/or misrepresents the material information set forth below in contravention to Sections 14(a) and 20(a) of the Exchange Act.

79.     The Proxy fails to provide the Company's shareholders with material information and/or provides them with false and materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

80.     The Proxy states that ATG formally engaged Morgan Stanley in December 2007, to act as a financial advisor to the Board. Proxy at 18.  However, the Company fails to describe in sufficient detail the process which led to the selection of Morgan Stanley, the specific criteria used during the selection process, or whether any other financial advisors were considered by the Board during the selection process.

81.     The Proxy does not describe in sufficient detail the sales process leading up to the Proposed Transaction.  For example, the Proxy alludes to a sales process that canvassed the market in 2007 and 2008 but fails to state the reasons that the Company did not canvas the

market again in 2010 and instead relied on what appears to be a staled sales process.   Proxy at 18.

82.     Further, the Proxy states that during the period in 2007 to present the Board considered numerous strategic alternatives. Proxy at 18-23. However, the Proxy fails to disclose the specifics and key terms of the various strategic alternatives considered by the Board.

83.     Moreover, the analyses in support of the fairness opinion prepared by Morgan Stanley on November 1, 2010 is replete with materially false statements and omissions. The opinion of Morgan Stanley fails to disclose information which would allow shareholders to intelligently determine whether or not they should vote in favor of the Proposed Transaction. Proxy at 26-32.  In particular, the Proxy is deficient and should provide, *inter alia*, the following:

> (a)     A description of the criteria and multiples observed by Morgan Stanley for each company in the *Comparable Company Analysis* for ATG. Further, a description of the criteria used to select the reference ranges used in the analysis;

> (b)     The identity of the "equity research analysts" and their respective share price targets for ATG observed by Morgan Stanley in its *Equity Research Analyst' Price Targets* section;

> (c)     A description of the criteria to select 2012 projections as the benchmark for the *Discounted Equity Value Research*. Further, the criteria to apply a discount rate of 9.2% in the analysis;

> (d)     A description of the criteria, multiples and premiums observed by Morgan Stanley for each company in its *Analysis of Precedent Transaction* for ATG. Further, a description of the criteria used to select the reference range used in the analysis;

84.     The complete set of projections for ATG relied upon by the Board and Morgan Stanley in rendering its fairness opinion, which must include ATG's free cash flows or the components necessary to reach free cash flows (e.g. depreciation, change in working capital,

operating income, assumed tax rate and whether stock based compensation was included as a cash expense).

85.     The information requested above in paragraphs 80-83 collectively amounts to the key inputs necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction.  Therefore, the aforementioned omitted information is highly relevant and material to ATG shareholders.

86.     Accordingly, because the foregoing material misstatements and omissions represent a violation of federal law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

<u>COUNT I</u>

**On Behalf of Plaintiff for Violations of Section 14(a) of the Exchange Act
Against the Individual Defendants and ATG**

84.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

85.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

86.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

87.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

88.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

89.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

### On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants and ATG

90.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

91.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of ATG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of ATG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

93.     Each of the Individual Defendants and ATG were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to

25

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

95.     ATG also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.  ATG, in fact, disseminated the Proxy and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Proxy to be published to shareholders.

96.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and ATG were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants and ATG participated in drafting and/or gave their input on the content of those descriptions.

97.     By virtue of the foregoing, the Individual Defendants and ATG have violated Section 20(a) of the Exchange Act.

98.     As set forth above, the Individual Defendants and ATG had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling

persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties Against the Individual Defendants

99.     Plaintiff repeats and realleges each allegation set forth herein.

100.    The Individual Defendants have violated fiduciary duties of care, loyalty, candor and good faith owed to public shareholders of ATG.

101.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in ATG.

102.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of ATG because, among other reasons, they failed to take steps to maximize the value of ATG to its public shareholders.   Moreover, the Individual Defendants failed to secure safeguards on behalf of the Company's shareholders, against the decline in the value of the stock component of the consideration to be paid to Oracle's shareholders in the Proposed Transaction.

103.    The Individual Defendants dominate and control the business and corporate affairs of ATG, and are in possession of private corporate information concerning ATG's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of ATG which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

104.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

105.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ATG's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

106.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

107.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## COUNT IV

### On Behalf of Plaintiff and the Class
### Against ATG and Oracle for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

108.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.     ATG has acted and is acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to ATG's public shareholders, and has participated in such breaches of fiduciary duties.

110.     ATG knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, ATG rendered substantial assistance in order to effectuate the

Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

111.   Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in its favor and in favor of the Class and against defendants as follows:

A.   Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.   Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

C.   Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.   Directing the Individual Defendants to account to Plaintiff  and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.   Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated:  November 23, 2010

Plaintiff Thomas Granados,

By his attorneys,

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan (BBO # 557109)
HUTCHINGS, BARSAMIAN,
  MANDELCORN & ZEYTOONIAN, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
(781) 431-2231
thess-mahan@hutchingsbarsamian.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Juan E. Monteverde
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
nfaruqi@faruqilaw.com
jmonteverde@faruqilaw.com

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 23, 2010.

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan